**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1623-17
                A-3672-17
                A-4177-17

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

DANUWELI M. KELLER,

       Defendant-Appellant.
_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

ABDUTAWAB KIAZOLU,

       Defendant-Appellant.
_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

PHOBUS E. SULLIVAN,

Defendant-Appellant.

_____

Submitted November 30, 2020 – Decided December 10, 2021

Before Judges Sabatino, Gooden Brown, and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment Nos. 17-01-0009 and 11-12-1209,[1] and Accusation No. 17-12-0801.

Joseph E. Krakora, Public Defender, attorney for appellant Danuweli M. Keller (Michael Confusione, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Abdutawab Kiazolu (Michele E. Friedman, Assistant Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Phobus E. Sullivan (John Vincent Saykanic, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent in A-1623-17 (Lauren Martinez, Assistant Prosecutor, of counsel and on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent in A-3672-17 and A-4177-17 (Brittany Saxton, Assistant Prosecutor, of counsel and on the briefs).

---

[1] Indictment No. 17-01-0009 supersedes Indictment No. 11-12-1209.

Appellant, Danuweli M. Keller, filed a pro se supplemental brief.[2]

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Defendant Danuweli M. Keller and others were charged in connection with the kidnapping, robbery, and murder of Dar Dar Paye,[3] and the kidnapping and robbery of Alfonso Slaughter. Following a jury trial, Keller was convicted of most of the charges related to Paye, including murder, and witness tampering related to Slaughter. The jury hung on the remaining charges. Keller was sentenced to an aggregate term of sixty-one years' imprisonment, fifty-six years of which are subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

At trial, the State alleged that in late 2010, Keller and several codefendants abducted Slaughter, held him at gunpoint in the basement of a house, restrained him and robbed him, but Slaughter managed to escape. A little over two months later, the men abducted Paye, held him at gunpoint in the basement of the same house, restrained him and robbed him. However, unlike Slaughter, Paye was

---

[2] Although the brief is labeled "[r]eplied" brief, we consider it a supplemental brief.

[3] Dar Dar alternately appears as Dardar in the record.

fatally shot in the head by Keller, wrapped in garbage bags, and placed in the trunk of Paye's car, a Buick LeSabre. Thereafter, Keller and his cohorts drove the Buick and two other vehicles during a high-speed chase, eluding police who attempted to conduct a motor vehicle stop after observing the drivers commit numerous traffic violations. Once the Buick finally stopped, one of the car's occupants repeatedly exclaimed he had "nothing to do with the guy in the back." Because there was no other occupant in the vehicle, an officer opened the trunk and found Paye's body.

On appeal, in his counseled brief, Keller raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT DENIED DEFENDANT A FAIR TRIAL BY DENYING DEFENDANT'S MOTION TO SEVER AND ORDER SEPARATE TRIALS FOR THE SLAUGHTER AND PAYE CRIMES.
>
> POINT II
>
> THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO ADMIT AT TRIAL HEARSAY STATEMENTS OF ALFONSO SLAUGHTER PURSUANT TO N.J.R.E. 804(B)(9).
>
> POINT III
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED BY POLICE.

4

POINT IV

THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT TO A FAIR JURY TRIAL BY DENYING DEFENDANT'S MOTION FOR A MISTRIAL AFTER THE JURY TWICE REPORTED BEING DEADLOCKED.

POINT V

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

In his pro-se brief, Keller makes the following arguments:

POINT I

TRIAL COUNSEL WAS INEF[F]ECTIVE FOR NOT BEING PRESENT DURING CRUCIAL STAGES OF THE TRIAL.

POINT II

THE COURT[']S FAILURE TO [VOIR] DIRE THE TWO JURORS IN DEFENDANT[']S TRIAL WHO WAS [SIC] STATED IGNORING THE LAW AND NOT TAKING THE OATH SERIOUSLY, VIOLATED DEFENDANT[']S RIGHT TO A FAIR TRIAL.  THUS VIOLATING DEFENDANT[']S SIXTH AMENDMENT [RIGHT] TO A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION; AMEND VI; AND ARTICLE 1 PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION.

POINT III

FAILURE OF THE COURT TO NOT SUBSTITUTE THE JURORS WHO WERE BIASED OR DECLARE A MISTRIAL WAS IMPROPER TO CONTINUE TO

5

HAVE BIASED JUROR[S] CONTINUE TO DELIBERATE.

Defendant Phobus E. Sullivan is a codefendant of Keller who was also charged in connection with the kidnapping, robbery, and murder of Paye and the kidnapping and robbery of Slaughter. Sullivan, who was driving the Buick when police tried to conduct the motor vehicle stop, fled on foot after stopping the car on Route 1 in Pennsylvania, but was soon apprehended by police. After losing his suppression motion related to the motor vehicle stop and other pre-trial motions, Sullivan entered a negotiated guilty plea to first-degree kidnapping, N.J.S.A. 2C:13-1(b), and admitted he participated in Paye's kidnapping. He was sentenced to eleven years' imprisonment, subject to NERA, to run consecutive to a sentence he was already serving on an unrelated homicide charge.

On appeal, Sullivan raises the following points for our consideration:

POINT I[4]

THE STOP OF THE BUICK WAS PRETEXTUAL AND NOT SUPPORTED BY A REASONABLE SUSPICION OF A TRAFFIC OR SAFETY VIOLATION IN VIOLATION OF THE UNITED STATES AND NEW JERSEY CONSTITUTIONS (U.S. CONST. AMEND. IV; N.J. CONST. ART. 1, PARA. 7).

---

[4] To avoid redundancy, we have omitted the portions of the point headings titled the standard of review, the law, and the Law Division decision.

POINT II

THE WARRANTLESS SEARCH OF THE TRUNK OF THE BUICK L[E]SABRE CANNOT BE JUSTIFIED BY THE EMERGENCY AID EXCEPTION AND THE SEIZURE OF THE BODY VIOLATED THE UNITED STATES AND NEW JERSEY CONSTITUTIONS MANDATING SUPPRESSION OF THE ILLEGALLY SEIZED CORPSE (U.S. CONST. AMEND. IV; N.J. CONST. ART. 1, PARA. 7).

POINT III

THE WARRANTLESS SEARCH OF THE TRUNK OF THE BUICK L[E]SABRE CANNOT BE JUSTIFIED BY THE INEVITABLE DISCOVERY EXCEPTION AND THE SEIZURE OF THE BODY VIOLATED THE UNITED STATES AND NEW JERSEY CONSTITUTIONS MANDATING SUPPRESSION OF THE ILLEGALLY SEIZED CORPSE (U.S. CONST. AMEND. IV; N.J. CONST. ART. 1, PARA. 7).

Defendant Abdutawab Kiazolu is another codefendant of Keller but was only charged with the offenses related to Paye. Kiazolu was an occupant of the vehicle driven by Keller during the high-speed chase. Keller's vehicle was tailgating the Buick when police attempted to conduct the motor vehicle stop. Like Sullivan, after losing the suppression motion, Kiazolu entered a negotiated guilty plea to a one-count accusation charging him with second-degree conspiracy to disturb human remains, N.J.S.A. 2C:2-6(b)(4) and 2C:22-1(a)(1),

and admitted he conspired with his codefendants in moving Paye's body.  He was sentenced to a flat ten-year prison term.

On appeal, Kiazolu raises the following points for our consideration:

POINT I

THE COURT'S FINDING THAT THE EMERGENCY AID EXCEPTION TO THE WARRANT REQUIREMENT WAS SATISFIED, BUT THAT COMMUNITY CARETAKING DOCTRINE WAS NOT, IS INCONSISTENT AND FUNDAMENTALLY FLAWED.

A.   The Motion Court's Determination That The Community Caretaking Doctrine Was Inapplicable, But There Was An Exigency Sufficient To Justify The Emergency Aid Doctrine, Is Legally Inconsistent.

B.   Under The Circumstances, There Was No Objectively Reasonable Basis To Believe That An Emergency Required The Detective's Immediate Assistance Under The Emergency Aid Doctrine.

POINT II

THE STATE FAILED TO DEMONSTRATE THAT THE EVIDENCE IN THE TRUNK WOULD HAVE BEEN DISCOVERED INEVITABLY ABSENT THE UNCONSTITUTIONAL SEARCH.

The three appeals were submitted to us back-to-back.  Because they share common facts and legal issues, we now consolidate them for the purpose of

8

issuing a single opinion.  We have considered all the arguments presented in light of the record and applicable legal principles.  We reject each of the points raised and affirm.

## I.

On January 4, 2017, a Mercer County grand jury returned a twenty-three-count superseding indictment against Keller, Sullivan, Kiazolu, and others[5] charging various crimes involving Paye and Slaughter.[6]  In counts one through thirteen pertaining to Paye, the indictment charged Keller, Sullivan, and Kiazolu with murder, N.J.S.A. 2C:11-3(a)(2) and 2C:2-6 (count two);[7] two counts of felony murder, N.J.S.A. 2C:11-3(a)(3) and 2C:2-6 (counts three and four); first-degree robbery, N.J.S.A. 2C:15-1(a)(1) and 2C:2-6 (count five); first-degree kidnapping, N.J.S.A. 2C:13-1(b) and 2C:2-6 (count six); two counts of third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a)(3) and 2C:2-6 (counts

---

[5]  Mack Edwards and William Daquan Brown were also charged.

[6]  Trial was scheduled to begin in September 2016 on the original indictment returned in 2011.  After a jury was selected but before it was sworn, Slaughter could not be located, prompting the trial judge to discharge the jury.  As a result of further investigation into witness tampering, a Mercer County grand jury returned the superseding indictment that is the subject of these appeals.

[7] In count one, Keller was also charged with murder, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), 2C:11-3(b)(4)(f), and/or 2C:11-3(b)(4)(g).

seven and eight); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) and 2C:2-6 (count nine); and fourth-degree tampering with physical evidence, N.J.S.A. 2C:28- 6(a)(1) and 2C:2-6 (count twelve). In counts ten and eleven, respectively, Keller and Sullivan were each charged separately with second-degree eluding, N.J.S.A. 2C:29-2(b). In count thirteen, Sullivan was charged with second-degree certain persons not to possess firearms, N.J.S.A. 2C:39-7.

In counts fourteen through twenty-three pertaining to Slaughter, Keller and Sullivan were charged with first-degree carjacking, N.J.S.A. 2C:15-2 and 2C:2-6 (count fourteen); first-degree kidnapping, N.J.S.A. 2C:13-1(b) and 2C:2-6 (count fifteen); first-degree robbery, N.J.S.A. 2C:15-1 and 2C:2-6 (count sixteen); and third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) and 2C:2-6 (count twenty). In count twenty-one, Keller was charged with third-degree witness tampering, N.J.S.A. 2C:28-5. In count nineteen, Sullivan was charged with second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a), and in count twenty-three, he was charged with second-degree certain persons not to possess firearms, N.J.S.A. 2C:39-7. In total, Keller was charged in sixteen counts. The remaining counts charged other codefendants who are not parties to these appeals.

A-1623-17

Following the adjudication of several pre-trial motions, Keller was tried jointly with codefendant Edwards, beginning May 30, 2017. After sixteen non-consecutive days of trial, during which the State produced twenty-three witnesses consisting primarily of law enforcement officers, on June 29, 2017, Keller was found guilty of counts two, three, four, five, nine, ten as amended,[8] twelve, and twenty-one. The jury hung on the remaining eight counts. Keller did not testify or produce any witnesses at trial. We glean the following facts from the trial record.

<u>Crimes Involving Victim Alfonso Slaughter</u>:

At about 8:00 a.m. on November 1, 2010, Alfonso Slaughter went to the Trenton Police Department and reported to Officer Hector Gonzalez and Detectives James Letts and Christopher Doyle that he had been "kidnapped and robbed." On that date, Slaughter gave a video recorded statement during which he did not identify the perpetrators. Subsequently, on June 10, 2011, after being charged with drug-related offenses and hoping to obtain leniency,[9] Slaughter provided a more detailed sworn written statement to Sergeant Michael

---

[8] Keller was found guilty of the lesser included offense of third-degree eluding.

[9] Slaughter had an extensive prior criminal history consisting primarily of drug distribution offenses.

Kruchinsky of the Trenton Police Department and Lieutenant James Francis of the Mercer County Prosecutor's Office, positively identifying the participants in the kidnapping and robbery as Keller, Edwards, Sullivan, Kiazolu,[10] Brown, and Tarweh Morris.[11]

During the June 10, 2011 statement, Slaughter explained he did not identify anyone during his initial report because he feared retaliation and "was afraid of [the defendants]." Slaughter's fear was well founded because subsequently, in September 2016, Keller and Edwards contacted Slaughter through threatening letters, phone calls, and other menacing means and convinced him not to testify against them at trial, notwithstanding the fact that Slaughter was held in contempt of court for violating a subpoena to testify and risked voiding his plea agreements with the State. As a result, on the State's pre-trial application, the trial judge admitted Slaughter's statements to police under

---

[10] Although Slaughter positively identified Kiazolu as a participant, he was never indicted for these charges.

[11] On July 8, 2011, about a month after giving his sworn statement, Slaughter entered into a plea agreement with the State to resolve his pending drug charges. Under the terms of the plea agreement, Slaughter agreed to provide truthful testimony in any matter involving the prosecution of Keller, Edwards, Sullivan, Kiazolu, Brown, and Morris. Thereafter, Slaughter was charged with another drug-related offense, leading to the execution of a second plea agreement on March 9, 2016.

12

N.J.R.E. 804(b)(9), which allows the admission of a statement against a party whose wrongdoing caused the declarant's unavailability as a witness. Thus, during the trial, Slaughter's November 1, 2010 and June 10, 2011 statements were presented to the jury in lieu of his live testimony.

In his statements, Slaughter told police he had arranged to meet Keller and Brown for a drug deal at 729 Monmouth Street in Trenton, a residence familiar to all the parties.[12] Slaughter had contacted Keller and Brown earlier after learning they had been robbed in Newark of "$12,000 worth of dope." At about midnight on November 1, 2010, Slaughter "parked on Monmouth Street" to await Keller's arrival. Suddenly, "two dudes with guns ran up to the car," "put a bag over [Slaughter's] head," and forced Slaughter into the backseat of his car. The men then "drove around the block" before taking Slaughter "into a house."

Inside the house, the men removed the bag, brought Slaughter "into the basement," "put [him] in a chair," "took [his] boots," and "duct taped [his] hands and legs."[13] Slaughter recognized the basement as 729 Monmouth Street

---

[12] The house was owned by a relative of Sullivan. Sullivan resided there and rented rooms to various individuals.

[13] Officer Gonzalez noted that when Slaughter arrived at the police station on November 1, 2010, he had duct tape "partially wrapped around his wrist" and

13

because "[he] had been there before." The men informed Slaughter they wanted "drugs or money" and proceeded to search Slaughter, taking his "keys, two phones, a cross, a set of yellow diamond earrings, [his] hat, . . . a scarf, and $80." However, "[t]hey missed [$3,500 he] had tucked in [his] briefs." Realizing he had been set up by his friends, Slaughter asked the men "why they were doing all this." One of the men replied, "it's not personal, . . . it's all about money," and stated "they were planning to get more people." As Slaughter "kept talking," the men "told [him] to shut up," and one man "hit [him] in the head with a little black gun,"[14] causing Slaughter to "f[a]ll out of the chair." The men "then redid the duct tape on [Slaughter's] hands and feet and put duct tape over [his] mouth." Later, Slaughter was "tied . . . to a pole in the basement with a phone cord."

Slaughter eventually told the men he had "some money at [his] mom's house," and the men decided they would go to Slaughter's mother's house after she left for work in the morning to search for the money. However, they threatened Slaughter that if they did not find any money, "they [were] going to kill [his] mother," and kill Slaughter "if [he told] anybody." The men then "went

---

was not wearing any shoes. Gonzalez also testified Slaughter appeared "scared [for] his life."

[14] According to Slaughter, he observed the man with the black gun put on "latex gloves."

upstairs and left [Slaughter] alone in the basement." Slaughter used the opportunity to "break[] out of the tape and the phone cord." When he heard the men leave the house, Slaughter crawled out of the basement, "ran out the door," "hopped two fences," and "flagged . . . down" a friend who drove Slaughter to his girlfriend's house. Upon arrival, Slaughter told his girlfriend everything that had happened. After Slaughter saw the car the men had taken from him "drive past [his] girlfriend's house," he went to the police station and reported the crimes.

Tarweh Morris testified for the State at trial and corroborated Slaughter's statements. Morris was initially indicted for his role in kidnapping Slaughter and pled guilty to criminal restraint pursuant to a plea agreement with the State that required him to testify against defendants. Morris explained that Keller planned to rob drug dealers to "[r]eplenish the funds" stolen from him in Newark. Morris also testified that at Keller's behest, he attempted to get Slaughter to sign an affidavit recanting his statements.

Crimes Involving Victim Dar Dar Paye:

About two months after Slaughter's abduction, on January 15, 2011, Dar Dar Paye was brought to the basement of 729 Monmouth Street where he was restrained, robbed, and killed.

15

Morris was visiting 729 Monmouth Street at the time and testified that Keller, Edwards, Sullivan, Kiazolu, and Brown were also at the house. However, Morris stated he remained upstairs most of the time "[w]atching a football game" on television. Ray Manigo testified at trial that he was a resident of 729 Monmouth Street and was also upstairs watching a football game at the time in question. Although Manigo had given statements to police implicating defendants in Paye's murder, at trial, Manigo recanted his statements and testified he had lied to the police. As a result, Manigo's January 20, 2011 video recorded statement to Lieutenant Francis and Detective Kruchinsky was played for the jury during the trial after the judge granted the State's application to admit the statement as a prior inconsistent statement pursuant to N.J.R.E. 803(a)(1).

In the statement, Manigo explained that while he was watching the football game upstairs, he was instructed to go to the basement. Keller, Edwards, Sullivan, and Kiazolu were present as well as "three other guys . . . [he] had never seen before." In the basement, Manigo observed a man he did not know "taped to [a] chair" and Keller with a "gun in his hand." The man was "struggling at first, but . . . wasn't going nowhere," and the others, including Keller, were "standing there watching him." Keller gave Manigo twenty dollars

16

and instructed him to go to a nearby store and "get two containers of bleach and . . . the big box of . . . trash bags."

When Manigo returned with the bleach and trash bags, the man was still in the chair, "squirming" and "struggling trying to get the tape off." Manigo was instructed to stay in the basement "for a while" because Sullivan "did not want [anyone] going out or coming in." Manigo stated everyone except him had on latex gloves. According to Manigo, Keller was "yelling" at the man, "ranting" and "cuss[ing]" him out, and "puffing his . . . chest up" as he "pac[ed] back and forth." Eventually, Keller "pointed the gun at [the man's] head" and "pulled the trigger," approximately "three inches away from [the man's] head." Manigo recounted the man's "head flew back, then it fell forward," and he "saw blood dripping down from [the man's] head."

Manigo stated everyone was silent for "maybe ten, [fifteen] seconds" after Keller shot the man. Then, Keller "started giving out instructions," and discussing how to get "rid of the body." Sullivan directed Manigo to go back upstairs. From there, Manigo observed Keller and Edwards "carry[] . . . a big black trash bag," containing what he "believed [to be the man's] body," outside of the residence and place it into the trunk of a "brown car."

17

Morris, who was outside after being instructed to leave the residence, also observed "[b]lack trash bags" containing what he believed was "[a] body" being placed in the trunk of "[a] Buick." After, Sullivan and Edwards entered the Buick while Keller and Kiazolu entered a white minivan parked in front of the Buick. Brown entered a silver Lincoln which was parked on the corner. According to Morris, all three cars then left in a "[c]onvoy," "following each other."

Testimony adduced from several law enforcement witnesses as well as video footage detailed defendants' path, driving in the three vehicles through Trenton towards Pennsylvania. Shortly before 1:00 a.m. on January 16, 2011, Trenton police officers recounted observing the vehicles traveling "in tandem" at "high speeds," "tailgating," and failing to "stop[] or yield[]" at intersections. The officers called for backup and attempted to conduct a motor vehicle stop but the vehicles eluded police in a high-speed pursuit that finally ended on Route 1 South near "the Oxford Valley [Mall] exit" in Pennsylvania. There, the Buick came to "an abrupt stop." The driver, later identified as Sullivan, "exit[ed] the vehicle and fled on foot," running "across the highway," but was eventually apprehended and detained.

A-1623-17

Contemporaneously, the passenger in the Buick, later identified as Edwards, was apprehended after he exited the vehicle and attempted to bypass the officers. When Edwards was detained, he began "screaming uncontrollably" that he had "nothing to do with the guy in the back." Based on his statement, officers "scanned the interior of the vehicle, . . . open[ing] the rear passenger side door, and shin[ing a] flashlight [onto] the floorboard area," but "did [not] see anybody there." As Edwards continued to yell "I got nothing to do with the guy in the back,"[15] an officer opened the trunk and "observed a body" wrapped in "garbage bags."

Meanwhile, the white minivan continued to elude police, but was eventually stopped by Pennsylvania State Troopers on Interstate 95 after spike strips were deployed to disable the vehicle. The driver and passenger, later identified as Keller and Kiazolu, respectively, were arrested at the scene of the stop. The silver Lincoln escaped capture.

The Buick was secured and ultimately towed to police headquarters. The body in the trunk, which was wrapped in black plastic garbage bags with "[r]ed drawstrings," was later identified as Dar Dar Paye. The medical examiner

---

[15] Police also observed a "rubber glove on the driver's seat of the [Buick]."

A-1623-17

testified Paye was killed by a "gunshot wound to the head" from close range. After the vehicle was impounded, a registration check revealed Paye was the owner of the Buick.

Upon obtaining a search warrant for the Buick, officers found "[sixteen] bags of suspected . . . heroin" and "a bag of marijuana in the front compartment of the vehicle," as well as rubber gloves on the "driver's seat" and "passenger side" floor. A subsequent search of the minivan conducted pursuant to a search warrant revealed black plastic garbage bags with red drawstrings containing various items. One bag contained "used gray duct tape," another contained "a latex glove" and a bloodstained piece of cardboard, and a third contained a bloodstained coat.[16] Subsequent DNA testing revealed that the blood on the coat and the cardboard matched Paye's.

During the ensuing investigation, police searched 729 Monmouth Street and recovered "a black leather wallet" containing Paye's "New Jersey driver[']s license" in "a storage area above the basement stairs." In various areas of the house, police also discovered an "empty box of . . . trash bags . . . with . . . red drawstrings," "a trash bag with a red tie," and rolls of duct tape. A chair, an

---

[16] Pennsylvania authorities obtained and executed the search warrants.

A-1623-17

"empty" bottle of Clorox bleach, "a piece of duct tape," and "pieces of cardboard" were found in the basement.

After the State rested, Keller moved for a judgment of acquittal pursuant to Rule 3:18-1, which the judge denied. Following the jury verdict, Keller was sentenced on September 7, 2017, and a conforming judgment of conviction was entered on September 22, 2017.

On December 8, 2017, Sullivan pled guilty to first-degree kidnapping of Paye (count six) and was sentenced on January 26, 2018. A conforming judgment of conviction was entered on January 29, 2018, and amended on February 12, 2018. On December 22, 2017, Kiazolu pled guilty to second-degree conspiracy to disturb human remains in connection with the removal of Paye's body and was sentenced on January 26, 2018. A conforming judgment of conviction was entered on January 29, 2018. These appeals followed.

## II.

All three defendants challenge the denial of their respective motions to suppress the evidence seized from the trunk of the Buick, specifically Paye's body. Keller argues "[t]he State did not prove that the stop of the Buick was premised on the required 'articulable and reasonable suspicion that the driver has committed a motor vehicle offense.'" Specifically, Keller asserts the

testimony given by detectives at the suppression hearing was "unrelated to the claimed speeding," and "there was no separate speeding ticket issued by law enforcement." Therefore, Keller proffers, "[t]he officers created a pretext to pursue the three vehicles." Keller further argues "[e]ven if the stop was valid, the State did not establish that the emergency-aid exception permitted the warrantless search of the Buick" because "there was no emergency in the case." Additionally, Keller asserts the State "did not prove the inevitable discovery doctrine applied." Accordingly, Keller urges us to reverse the judge's denial of his suppression motion and "vacate [his] subsequent convictions [which were] premised in large part on the evidence unlawfully seized by the police."

Sullivan's arguments are similar. He asserts "the stop was pretextual and not based on any legitimate motor vehicle violations," but rather "an unsubstantiated and unsupported hunch." Sullivan also asserts there was no "reasonable basis for a belief that an emergency life-threatening situation existed" to obviate the warrant requirement, and "[t]he State's argument as to the applicability of the inevitable discovery exception is purely speculative."

Kiazolu does not contest the motor vehicle stop but argues the judge's "finding that there was no exigency under the community caretaking doctrine, but there was nonetheless a sufficient exigency under the emergency aid

exception to the warrant requirement, is legally inconsistent" and "fundamentally flawed." Specifically, Kiazolu argues "[i]f there were no emergent circumstances for purposes of the community caretaking exception – as the motion court correctly found – then, there also must have been no exigency in the context of the emergency-aid sister doctrine." Kiazolu also argues "there is no basis in the record to support the conclusion that the evidence in the Buick's trunk would have inevitably been discovered."

During the four-day suppression hearing, the judge heard testimony from the "three detectives involved in the high-speed pursuit," Detectives Charles Steever, Jason Astbury, and Aaron Bernstein, respectively, an eight-and-a-half-year, fifteen-year, and ten-year veteran of the Trenton Police Department. The judge also reviewed "video surveillance" showing the three vehicles' "failure to yield to the detective's emergency lights," and examined the motor vehicle tickets issued, computer-aided dispatch (CAD) reports, and audio recordings of the police dispatch admitted into evidence. Thereafter, on June 30, 2014, the judge issued an order and accompanying thirty-five-page written opinion denying the motions to suppress the evidence found in the Buick's trunk.

In the opinion, the judge made credibility assessments, finding the three "experienced detectives" to be "credible witnesses." The judge found their

23

testimony to be "forthcoming," "truthful," "consisten[t]" in "the major aspects," and supported by "the CAD radio transmission."  Crediting their testimony, the judge made the following factual findings:

> After midnight on Sunday, January 16, 2011, Detective Charles Steever and partner, Detective Jason Astbury were operating as Unit 543, an unmarked police vehicle, as part of the City of Trenton Police Department Tactical Anti-Crime (T.A.C.) unit.  At the time, both [d]etectives were dressed in the TAC uniform of the day, which prominently displayed police identifiers.
>
> At approximately 12:54 a.m. the detectives were on patrol in the area of Anderson Street and Hamilton Avenue in the City of Trenton.  They were parked, with the engine running, on South Anderson approximately [fifty] yards south of the intersection with Hamilton Avenue . . . .  Both detectives testified they had an unobstructed and well[-]lit view of North Anderson and observed three vehicles driving south on North Anderson and each made a right hand turn on to Hamilton Avenue within several feet of each other driving one after another at a high rate of speed.
>
> The vehicles were as follows:  (1) a silver four door vehicle, followed by (2) a tan, four door Buick ("Buick") with a different colored driver's side door panel,[17] followed by (3) a white minivan.

---

[17]  Although the detectives suspected the Buick was the subject of a "be on the lookout" (BOLO) alert related to its suspected involvement in a series of recent home invasions, the State only relied on the motor vehicle violations as the legal basis for the stop.

A-1623-17

Having observed and determined the vehicles committed the aforesaid motor vehicle violations, the detectives made a left from Anderson Street onto Hamilton Avenue, to follow the three vehicles. The two detectives observed the vehicles maintain a close proximity to each other at an estimated speed up to 40 to 50 MPH in excess of the 25 MPH speed limit down Hamilton Avenue, a residential area, toward Chestnut Avenue. Detective Steever drove the patrol car while Detective Astbury operated radio communications.

Back-up units were called to assist as detectives continued to follow the speeding vehicles down Hamilton Avenue by South Clinton Avenue. At this intersection the three vehicles almost struck another vehicle . . . . At this point, the detectives made a decision to stop the three vehicles for motor vehicle violations.

The vehicles continued at a high rate of speed, making a right on South Clinton Avenue, a left onto Market Street, a right onto Stockton Street and a final right onto Route 1 South. At this point, back up Unit #411 comprised of Officer Gliottone and Carrigg, joined the pursuit, pulling behind Detective Astbury and Detective Steever. As the detectives were in an unmarked vehicle that would not be as noticeable, Detective Astbury instructed Unit #411 to activate its lights and siren in the hope all three vehicles would stop.

Unit #411 activated its lights and sirens, yet all three vehicles continued to travel at a high rate of speed. None of the vehicles yielded to the officers' signals as they travelled down Route 1 South.

. . . .

25

A-1623-17

. . . The high[-]speed pursuit continued onto Route 1 [s]outhbound in Pennsylvania . . . , where the Buick cut off several vehicles causing the vehicles to swerve out of the way to avoid being struck. The chase reached speeds of 70 to 80 miles per hour.

The silver vehicle was able to exit at Route 1 South at the Route 13 exit and escape capture. As there were only two police units in pursuit, Detectives Steever and Astbury continued their pursuit of the tan Buick, and Officers Carrigg and Glittone continued their pursuit of the minivan.[18]

The Buick continued on Route 1 South for several miles with Detectives Steever and Astbury in pursuit with flashing lights and sirens, where it swerved at one point toward the right shoulder almost leaving the roadway and continued in the shoulder for a short distance as if the occupants were attempting to discard something out of the moving vehicle. . . . The vehicle then swerved back into the roadway and continued on Route 1 South before coming to an abrupt halt near the Sesame Place/Oxford Valley Road exit.

As the Buick stopped, Detectives Steever and Astbury parked their unmarked sedan behind it. At the time of the Buick's stop, Detectives Ramos and Bernstein arrived on the scene and blocked the front of the Buick to prevent its ability to leave the scene. The driver, later identified as defendant, Phobus Sullivan, immediately exited the vehicle and fled on foot. . . . Detective Steever chased after Phobus Sullivan, giving clear and direct orders to stop.

---

[18]  According to the judge, when "[t]he minivan was eventually stopped by the Pennsylvania State Police on [Interstate] 95 South in . . . Pennsylvania[,]" the occupants, "Keller and Kiazolu were arrested."

At the same time, Detective Astbury approached the passenger side of the Buick to detain the passenger, later identified as defendant Mack Edwards. As Edwards exited the vehicle, Detective Astbury ordered him to show his hands and remain where he was. Edwards did not comply with orders, and attempted to force his way past Detective Astbury. . . . Believing that Edwards was armed with a weapon, Detective Astbury placed Edwards in a headlock and ordered him to place his hands behind his back. Edwards again did not comply with the orders. . . . [A] struggle[] ensued until Edwards finally relinquished his hands and submitted to arrest.

. . . Detective Bernstein assisted Astbury in securing Edwards. . . . After [Edwards] was handcuffed and positioned on the shoulder of Route 1 [S]outh, Edwards was screaming "oh no," "I got nothing to do with the guy in the back." Detective[s] Astbury and Bernstein looked at each other since they were not aware of any "guy in the back" and such a person could potentially pose a danger to them. Bernstein had entered the front driver door to move the gear shift into park and Astbury had struggled with Edwards as he exited the open front passenger door but neither had seen an additional person in the Buick.[19]

Concerned for his safety, Detective Astbury opened the passenger back door of the Buick, but observed no one. He quickly scanned the interior of the vehicle with a flashlight, and observed a green colored

---

[19] The judge noted that Edwards' statement "was not captured by the officers' radio[s] worn on their vest[s], nor by the vehicle radio" and therefore was not in the CAD report. However, the judge found "[t]he CAD transcript support[ed] the detectives['] testimony that their personal radios worn on their vests were not working."

rubber glove on the front driver's seat.[20]  Detective Astbury walked around to the open driver's door while Edwards continued to yell "I got nothing to do with the guy in the back!"

According to the judge, at that juncture, Detective Astbury considered the following in deciding how to proceed:

> [the] statements of Edwards that an individual was in the back of the vehicle, the high[-]speed chase from Trenton into Pennsylvania, the fact Sullivan ran from the vehicle to continue his attempt to elude capture, the attempt by Edwards to run past Astbury to escape, Edwards['s] excited state, and no person located in the interior cabin of the vehicle.

Based on those considerations, out of "concern[] for the safety of the 'guy,'" Astbury "pushed the trunk release button to check the trunk for the 'guy' Edwards was yelling about," "lifted the trunk and observed a body."  Astbury promptly "checked for a pulse, but could not locate one."

The judge recounted that "[t]he vehicle was secured as a homicide scene by Detectives Astbury and Bernstein," and "[i]t was later determined the Buick's owner was the victim, Dardar Paye."  The judge noted "the Buick would not be

---

[20]  The judge found that "Detective Astbury visually examined the green colored rubber glove," which "appeared to be inside out, as if someone had removed it from their hand," and "alerted the other units in pursuit via radio that a suspect in the Buick was wearing rubber gloves."  The detectives testified that "a suspect may wear gloves to avoid leaving fingerprints."

released to any of the defendants[] arrested since none of the four [was] the owner." Further, "[t]he standard procedure of the Trenton Police Department [was] to contact the owner," or "a family member" to "obtain consent to search the vehicle." If those attempts were unsuccessful, "the Trenton [p]olice would request a search warrant to search the car." In that regard, the judge credited Detective Astbury's testimony "that although he never viewed any CDS in the vehicle, he was advised there was suspected marijuana inside the vehicle in plain view by the front passenger seat," which "observation . . . would have led the detectives to apply for a search warrant to search the Buick."

Applying the governing legal principles, the judge first determined the motor vehicle stop was lawful based on the detectives' objectively reasonable belief that motor vehicle violations had occurred. Detectives Steever and Astbury observed all three vehicles engage in various motor vehicle violations as a result of which Sullivan, the Buick's driver, was ultimately issued tickets for careless driving, N.J.S.A. 39:4-97, "encompass[ing] . . . tailgating, speeding, and failure to come to a complete stop at [the] Anderson and Hamilton Avenue stop sign," reckless driving, N.J.S.A. 39:4-96, for almost striking another vehicle "at the intersection of Hamilton and South Clinton Avenues," and failure to yield to an emergency vehicle, N.J.S.A. 39:4-91, "at the Warren Street ramp

onto Route 1 South."  In rejecting defendants' contention that the detectives' failure to issue a speeding ticket was fatal to the State's proofs, the judge credited Detective Steever's testimony that "such a ticket was not issued because there was no radar detection system in his vehicle."

Next, the judge held that while the community caretaking exception did not apply to the search of the trunk, the facts fell squarely within the scope of the emergency aid doctrine.  In finding the community caretaking exception did not apply, the judge explained:

> The community caretak[ing] exception to the warrant requirement applies in situations where the police are already aware of an immediate emergency which requires their attention.  Here, Detective Astbury had a belief there may be a person in the trunk of the vehicle, however, he had no reason to believe a specific person was in the trunk.  Police were not actively looking for the victim, as he had not been reported missing.

On the other hand, applying the emergency aid doctrine, the judge found:

> [I]n light of defendant Edward's statement as to the "guy in the back" along with the [o]fficers' observation [that] no person was in the passenger compartment of the vehicle, under the totality of the circumstances, it was reasonable for Detective Astbury to believe an individual may have been in the trunk of the vehicle, and may have required immediate life-saving assistance.

30

The judge further noted he did not have to find that "Detective Astbury's belief was 'a near certainty as to the presence of the person at risk in the [trunk].'" Additionally, according to the judge, because "the vehicle had just been in a high-speed chase and Edwards and Sullivan both attempted to flee, it was reasonable for Detective Astbury to conclude there may have been a person in peril in the trunk of the vehicle." The judge found Detective Astbury's "intention when looking in the trunk was to provide life-saving aid to a person he believed he would find inside," and was "limited" to the "specific purpose of checking to see if there was a person in the trunk." Notably, "after determining the victim was deceased, Detective Astbury did not continue to search the trunk or the interior compartment of the Bu[i]ck."

Finally, the judge concluded that even if the emergency aid doctrine did not apply, "the victim's body would have inevitably been discovered through legitimate means" independent of Detective Astbury's discovery. The judge expounded:

> It is clear to this [c]ourt the vehicle would have been impounded as none of the arreste[es was] the owner of the vehicle. After being impounded, the Buick would have undergone a search, either due to an inventory search, a warrant based upon the marijuana and rubber glove found in the vehicle, or the impending odor that would have occurred as a result of the decomposition of the body. Any one of these lawful means of

31

searching the vehicle would have resulted in the victim's body being discovered, and would have occurred, wholly independently of the discovery of the victim's body as a result of a warrantless search. Additionally, as testified to by the Trenton detectives, the . . . search of the vehicle[']s registration showed the car belonged to the victim whom police would have attempted to find. After contacting family members and not finding the missing person, police would have obtained a warrant to search the vehicle to determine the owner[']s whereabouts. . . . [T]he State need not demonstrate the precise manner which would have led to the discovery, only present facts sufficient to persuade this court by a clear and convincing [evidence] standard the body would have been discovered. Here, the court finds by clear and convincing evidence the victim's body would have ultimately been discovered through one of the means the State suggested. Therefore, the evidence found in the trunk of the Buick does not require suppression.

In our review of the denial of a suppression motion, we "must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Sencion, 454 N.J. Super. 25, 31 (App. Div. 2018) (quoting State v. Boone, 232 N.J. 417, 425-26 (2017)). We defer to the judge's factual findings "because the motion judge, unlike an appellate court, has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gonzales, 227 N.J. 77, 101 (2016) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). However, "[w]e owe no deference . . . to conclusions

of law made by trial courts in suppression decisions, which we instead review de novo." Sencion, 454 N.J. Super. at 31-32 (citing State v. Watts, 223 N.J. 503, 516 (2015)).

Here, we are satisfied the judge's factual findings are amply supported by sufficient credible evidence in the record and turn to our de novo review of the judge's legal conclusions. We begin our analysis by considering whether the stop was justified.

"To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'" State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40 (2002)). The required "'articulable reasons' or 'particularized suspicion' of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced . . . in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from those facts." State v. Davis, 104 N.J. 490, 504 (1986).

Here, the automobile stop "had all the indicia of validity." Bacome, 228 N.J. at 103. As the judge found, the stop followed the detectives' observations of multiple traffic code violations for which the driver was issued numerous

motor vehicle summonses.  We reject Keller's and Sullivan's arguments that the stop was pretextual because there was no specific motor vehicle summons issued for speeding.  The issuance of such a summons would have been superfluous under the circumstances.  Because the objective reasonableness of the stop was amply supported by the record, we discern no legal or factual basis to interfere with the judge's well-founded decision.

Next, we turn to the propriety of the warrantless search of the trunk.  "Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures."  State v. Minitee, 210 N.J. 307, 318 (2012); see also U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  "'[O]ur constitutional jurisprudence evinces a strong preference for judicially issued warrants . . . .'"  State v. Chisum, 236 N.J. 530, 545 (2019) (quoting State v. Mann, 203 N.J. 328, 337 (2010)).  "So important is the requirement that the police obtain a warrant before proceeding to conduct a search that a search conducted without a warrant is presumed to be invalid."  Minitee, 210 N.J. at 318.  For that reason, when a warrantless search is challenged, the State bears the burden of proving by a preponderance of the credible evidence that the search is "justified by one of the '"well-delineated

exceptions" to the warrant requirement.'" State v. Shaw, 213 N.J. 398, 409 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

"One such exception to the warrant requirement . . . is the emergency-aid doctrine." State v. Hathaway, 222 N.J. 453, 468 (2015) (citation omitted). "The emergency-aid doctrine is a 'species of exigent circumstances . . . .'" Id. at 468-69 (quoting United States v. Martins, 413 F.3d 139, 147 (1st Cir. 2005)). To invoke this doctrine, the State must show "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched." Id. at 470 (alteration in original) (quoting State v. Edmonds, 211 N.J. 117, 132 (2012)).

> The primary rationale for the doctrine is that neither the Fourth Amendment nor Article I, Paragraph 7 of our State Constitution requires "that public safety officials stand by in the face of an imminent danger and delay potential lifesaving measures while critical and precious time is expended obtaining a warrant."
>
> [Id. at 469 (quoting Frankel, 179 N.J. at 599).]

"The emergency aid doctrine only requires that public safety officials possess an objectively reasonable basis to believe – not certitude – that there is a danger and need for prompt action." Id. at 470 (quoting Frankel, 179 N.J. at

35

599).  Thus, "[t]he reasonableness of a decision to act in response to a perceived danger in real time does not depend on whether it is later determined that the danger actually existed."  Ibid.  To that end, "[w]hen viewing the circumstances of each case, a court must avoid 'the distorted prism of hindsight' and recognize 'that those who must act in the heat of the moment do so without the luxury of time for calm reflection or sustained deliberation.'"  Id. at 469 (quoting Frankel, 179 N.J. at 599).  Indeed, "[a] court must 'examine the conduct of those officials in light of what was reasonable under the fast-breaking and potentially life-threatening circumstances that were faced at the time.'"  Ibid. (quoting Frankel, 179 N.J. at 599).  Additionally, "[p]olice officers oftentimes must rely on information provided by others in assessing whether . . . there is an objectively reasonable basis to believe an ongoing emergency threatens public safety."  Id. at 470-71.

"The scope of the search under the emergency aid exception is limited to the reasons and objectives that prompted the search in the first place."  Id. at 470 (quoting Frankel, 179 N.J. at 599).  "Therefore, police officers looking for an injured person may not extend their search to small compartments such as 'drawers, cupboards, or wastepaper baskets.'"  Ibid. (quoting Frankel, 179 N.J. at 599).  "If, however, contraband is 'observed in plain view by a public safety

official who is lawfully on the premises and is not exceeding the scope of the search,' that evidence will be admissible." Ibid. (quoting Frankel, 179 N.J. at 599-600).

While "related," the emergency aid and community caretaking exceptions are doctrinally "separate exceptions." State v. Witczak, 421 N.J. Super. 180, 192 (App. Div. 2011). Under the community caretaking exception, first enunciated by the United States Supreme Court in Cady v. Dombrowski, 413 U.S. 433 (1973), police may "engage in what has been 'described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" State v. Garbin, 325 N.J. Super. 521, 525 (App. Div. 1999) (quoting State v. Navarro, 310 N.J. Super. 104, 108 (App.Div.1998)). In that capacity, "police officers, who act in an objectively reasonable manner, may check on the welfare or safety of a citizen who appears in need of help on the roadway without securing a warrant or offending the Constitution." State v. Scriven, 226 N.J. 20, 38 (2016); see also State v. Diloreto, 180 N.J. 264, 275 (2004) ("The 'community caretaker doctrine' provides another basis on which to excuse the warrant requirement." (quoting State v. Cassidy, 179 N.J. 150, 161 n.4 (2004))).

However, "the community caretaking responsibility must be a real one, and not a pretext to conduct an otherwise unlawful warrantless search." State v. Bogan, 200 N.J. 61, 77 (2009). Generally, "the community caretaker doctrine . . . is based on a service notion that police serve to ensure the safety and welfare of the citizenry at large," Diloreto, 180 N.J. at 276 (quoting John F. Decker, Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions, 89 J. Crim. L. & Criminology 433, 445 (1999)), while "[t]he emergency aid exception focuses on . . . 'the existence of an emergency as viewed objectively, . . . a search not motivated by a desire to find evidence and . . . a nexus between the search and the emergency.'" Witczak, 421 N.J. Super. at 192 (quoting Cassidy, 179 N.J. at 161). "Thus, the emergency aid exception is one aspect of the police's community caretaking functions, but '[t]he community caretaker exception . . . is an independent and broader exception to the Fourth Amendment.'" Ibid. (alterations in original) (quoting State v. Deneui, 775 N.W.2d 221, 251-52 (S.D. 2009) (Meierhenry, J., dissenting)).

Here, we agree with the judge that the emergency aid exception justified the warrantless search of the trunk. Contrary to defendants' assertions, based on the swiftly moving events and uncertain circumstances confronting him, Detective Astbury had an objectively reasonable basis to believe an emergency

38

required immediate assistance to protect or preserve life or prevent serious injury. In that regard, Astbury was confronted with Edwards's excited utterances about an individual in the back of the vehicle when there was no other person in the car's passenger compartment, the high-speed chase from Trenton into Pennsylvania, Sullivan's flight from the vehicle to continue to elude capture, and Edwards' attempt to flee. Further, there was a reasonable nexus between the emergency and the area searched as the trunk was the only other part of the vehicle where a person could have been located, and the search was, in fact, confined to the trunk.

Kiazolu argues "the dearth of sounds emanating from the car should have objectively dispelled any suspicion that the trunk contained a person in need of emergency medical care." On the contrary, under the circumstances, the detective would have been remiss in his duties if he had failed to open and search the trunk after confirming there was no other occupant in the interior compartment. To hold otherwise would subject our examination of the detective's conduct to the prohibited "distorted prism of hindsight." Frankel, 179 N.J. at 599. "That the perceived danger, in fact, may not have existed does not invalidate the reasonableness of the decision to act at the time." Ibid. Thus,

the search of the trunk and the seizure of the body were justified under the emergency aid doctrine.

We need not resolve whether the community caretaking exception also allowed the detective to open the trunk without a warrant to ensure the safety of any potential victim. Suffice it to say that the detective's actions fell well within the legally accepted limits of the emergency aid doctrine, and we reject Kiazolu's contention that any "legal-incongruity" between the judge's finding that the emergency aid doctrine applied but the community caretaking exception did not, rendered the ruling "legally inconsistent" or "fundamentally flawed." On that point, contrary to Kiazolu's assertion, the judge's rejection of the applicability of the community caretaking doctrine was not predicated on insufficient exigency.

We briefly address defendants' challenge to the judge's separate determination that the body in the Buick's trunk would have been inevitably discovered even if the warrantless search was not justified. The "inevitable-discovery" doctrine is an "exception to the exclusionary rule" permitting the use of unlawfully seized evidence in criminal prosecutions. State v. Holland, 176 N.J. 344, 361 (2003).

40

Under the "inevitable discovery" doctrine, the State must "show by clear and convincing evidence" the following:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.

[State v. Maltese, 222 N.J. 525, 552 (2015) (quoting State v. Johnson, 120 N.J. 263, 289 (1990)).]

"[U]nder this standard, 'the State need not demonstrate the exact circumstances of the evidence's discovery . . . . It need only present facts sufficient to persuade the court, by a clear and convincing standard, that the [evidence] would be discovered.'" Ibid. (second and third alterations in original) (quoting State v. Sugar, 108 N.J. 151, 158 (1987)). "If the State can show that 'the information ultimately or inevitably would have been discovered by lawful means . . . the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received.'" Id. at 551-52 (alterations in original) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).

41

Guided by these principles, we conclude the State met its burden of establishing by clear and convincing evidence that normal police procedures would inevitably have led to the discovery of the body in the Buick's trunk wholly independently of the warrantless search. Contrary to Keller's and Sullivan's arguments, the State did not merely "speculate[] on what might have occurred," but demonstrated several different ways in which the body could have been discovered. The State "'need not establish the exclusive path leading to the discovery. . . . It may [satisfy its burden] by demonstrating that such discovery would occur in one or in several ways. A number of possibilities may cumulatively constitute clear and convincing evidence that the evidence would be discovered.'" State v. Finesmith, 406 N.J. Super. 510, 523 (App. Div. 2009) (alterations in original) (quoting Sugar, 108 N.J. at 158-59). Accordingly, we are satisfied the judge properly applied the doctrine's three-prong test and reject defendants' contentions to the contrary.

## III.

In Point I of his counseled brief, Keller argues the judge erred in denying his motion to sever the Paye counts from the Slaughter counts. According to Keller, the abduction of Slaughter and the murder of Paye were separate and distinct offenses and "[p]ermitting the evidence from the Slaughter incident was

highly prejudicial to defendant on the charges of the Paye incident" for which he was found guilty. Keller contends the only "commonality between the two incidents was [that] the abduction and robbery [occurred] inside the basement of the same home." Conversely, Keller asserts "the incidents occurred more than two months apart," and while Slaughter was "lured to the location via the promise of a drug sale," there was "insufficient evidence [to] show[] that this lure was used in the Paye crime."

Whether severance should be granted is within the trial judge's discretion, and we will defer to that decision absent an abuse of discretion. State v. Chenique-Puey, 145 N.J. 334, 341 (1996). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). "An appellate court can also discern an abuse of discretion when the trial court fails to take into consideration all relevant factors and when its decision reflects a clear error in judgment." State v. S.N., 231 N.J. 497, 515 (2018) (quoting State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017)).

Rule 3:7-6 permits joinder when two or more offenses are "of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan." However, a court may sever joined charges "[i]f . . . it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses." R. 3:15-2(b). Although a defendant must offer "[m]ore than a cavil allegation of prejudice . . . to warrant an order for separate trials of properly joined offenses," State v. Reldan, 167 N.J. Super. 595, 598 (Law Div. 1979), aff'd in part, rev'd in part on other grounds, 185 N.J. Super. 494 (App. Div. 1982), the remedy of severance "should be liberally granted if there is a possibility of substantial harm." Pressler & Verniero, Current N.J. Court Rules, cmt. 1.1 on R. 3:7-6 (2021).

In deciding a motion for severance, the trial court must "weigh the interests of judicial economy and efficiency against the right of every accused to have the merits of his case fairly decided." State v. Scioscia, 200 N.J. Super. 28, 43 (App. Div. 1985). While judicial economy and efficiency are important considerations, the "key factor in determining whether prejudice exists from joinder of multiple offenses is 'whether the evidence of [those] other acts would be admissible in separate trials under [N.J.R.E. 404(b).]'" State v. Krivacska,

341 N.J. Super. 1, 38 (App. Div. 2001) (alterations in original) (quoting State v. Moore, 113 N.J. 239, 274 (1988)).  Thus, when determining whether counts must be severed, a court must examine each charge sought to be severed and determine if evidence of each charge "would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges"; if so, such charge shall not be severed.  State v. Sterling, 215 N.J. 65, 73 (2013) (alteration in original) (quoting Chenique-Puey, 145 N.J. at 341).

Under N.J.R.E. 404(b), evidence of other crimes is inadmissible to prove a "defendant's criminal disposition as a basis for establishing guilt of the crime charged."  State v. Covell, 157 N.J. 554, 563 (1999).  However, evidence generally inadmissible under N.J.R.E. 404(b) is expressly admissible "to prove other facts in issue, such as 'motive, intent, plan, knowledge, identity, or absence of mistake or accident.'"  Id. at 563-64 (quoting State v. Stevens, 115 N.J. 289, 293 (1989)).  Other-crimes evidence may also "be admitted when relevant to some fact in issue not specifically referred to in N.J.R.E. 404(b)(2)."  Biunno, Weissbard, & Zegas, Current N.J. Rules of Evidence, cmt. 15 on N.J.R.E. 404 (2021).

To be admissible under N.J.R.E. 404(b), other-crimes evidence must satisfy the well-established four-prong test set forth in State v. Cofield, 127 N.J.

45

328 (1992). Specifically, to be admissible, evidence of other crimes must: 1) be "'relevant to a material issue'"; 2) "'be similar in kind and reasonably close in time to the offense charged'"; 3) "'be clear and convincing'"; and 4) have probative value that is not "'outweighed by its apparent prejudice.'" Id. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b) and 609(a), 38 Emory L.J. 135, 160-61 (1989)).[21] We accord a trial judge "ample discretion in determining whether to grant relief from joinder of offenses because of the potential for prejudice." State v. Pitts, 116 N.J. 580, 601 (1989).

Here, in his June 10, 2016 written opinion denying Keller's motion to sever, the judge determined severance was not warranted because the Slaughter and Paye crimes were "not only similar, connected and probative of one another, but such evidence [was] admissible N.J.R.E. 404(b) evidence under the Cofield analysis." The judge noted both crimes involved the same "three defendants; . . . occurred at night in the basement of 729 Monmouth Street; and . . . involved a nearly identical method consisting of duct taping the victim to a wooden chair and robbing them."

---

[21] Our Supreme Court has since recognized that the second prong does not necessarily apply in all cases. State v. Williams, 190 N.J. 114, 130-34 (2007).

Specifically, in applying the first prong of the Cofield test, the judge found the evidence of the Slaughter crimes relevant to motive, identity, and opportunity in the Paye crimes. Acknowledging that Slaughter was a self-proclaimed drug dealer, the judge credited Slaughter's statement "that he was targeted because . . . defendants believed he would have cash and/or drugs on him," as well as Morris's statement that "defendants were targeting and robbing other drug dealers after Keller and Brown were robbed in Newark." The judge determined the statements revealed defendants' motive and was satisfied the "motive for kidnapping and robbing Paye [could] be demonstrated through the Slaughter kidnapping and robbery."

Regarding opportunity, the judge stated defendants "had the ability to carry out crimes of this complexity" without raising the suspicion of neighbors or other residents of the house because they had "unfettered access" to "a private location to perform them," namely, the basement of 729 Monmouth Street. As to identity, the judge found "Slaughter and Paye were both duct[-]taped to an old wooden chair in the basement of the residence" and therefore the residence "[could] be used to identify the defendants involved in the crimes."

Next, the judge determined the second prong of the Cofield test was satisfied because the "offenses were similar in that the method in which they

were completed . . . were nearly identical," and "they were committed two[-]and[-]one[-]half . . . months apart."  As to the third prong of the Cofield test, the judge found "the standard of clear and convincing evidence [was] met" based "on the eyewitness statements of Slaughter, Tarweh Morris, and Ray Manigo, as well as other evidence discovered at . . . 729 Monmouth [Street]" including "[a]n empty box of black garbage bags with red drawstrings, an empty bottle of bleach, and items belonging to Paye."  Finally, turning to the fourth prong of the Cofield test, the judge found "the evidence from the kidnapping and robbery of Slaughter [was] highly probative in the trial for the murder of Paye," and "[w]hile there is always a threat of prejudice in any 'other-crimes' analysis, the probative value of the evidence . . . is not outweighed by its potential prejudice to defendants."

We discern no abuse of discretion in the judge's denial of Keller's severance motion.  We know the jury was able to consider guilt as to each victim separately because it did not convict Keller of the kidnapping and robbery of Slaughter.  Thus, contrary to Keller's contention, joinder of crimes related to both victims in one trial was not unduly prejudicial.

48

IV.

In Point II of his counseled brief, Keller argues the judge "erred in permitting Slaughter's hearsay testimony to go before the jury per N.J.R.E. 804(b)(9)," the admission of which "infringed defendant's federal and state confrontation rights." We disagree.

"We begin by noting that '[a] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Rinker, 446 N.J. Super. 347, 358 (App. Div. 2016) (alteration in original) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). "However, when the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence, our review is de novo." Ibid.

Pursuant to N.J.R.E. 804(b)(9), the so-called forfeiture-by-wrongdoing exception to the hearsay rule, the hearsay statement of an unavailable witness is admissible against a party if that party "engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." In State v. Byrd, 198 N.J. 319, 324 (2009), our Supreme Court embraced this exception to the hearsay rule to achieve "three important policy objectives." First, the rule "ensure[s] that a criminal defendant will not profit from making a witness unavailable to testify." Id. at 324-35. Second, it

"provide[s] a powerful disincentive against witness intimidation."  Id. at 325. Last, it "further[s] one of the primary goals of every trial – the search for truth." Ibid.

"Significantly, the admission of evidence under the forfeiture-by-wrongdoing [exception] does not offend the Sixth Amendment to the United States Constitution," because "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."  Id. at 339-40 (quoting Davis v. Washington, 547 U.S. 813, 833 (2006)).  "Accordingly, the forfeiture-by-wrongdoing [exception] is grounded in common sense, supported by public policy, and does not run afoul of the federal Confrontation Clause." Id. at 340.

"When the State intends to introduce a witness's statement through [N.J.R.E. 804(b)(9)], it must make known its intention as soon as reasonably practicable."  Id. at 350.  "Ordinarily, the State should advise defense counsel and the court as soon as it becomes aware that the defendant's wrongful conduct has made the witness unavailable and that it intends to offer the witness's out-of-court statement into evidence."  Ibid.  Indeed, "N.J.R.E. 807 . . . specifically permits the judge to exclude the evidence when 'it appears that the proponent's intention to offer the statement in evidence was not made known to the adverse

party at such time as to provide that party with a fair opportunity to meet it.'" Rinker, 446 N.J. Super. at 359 (quoting N.J.R.E. 807).

"Next, the trial court must conduct an N.J.R.E. 104(a) hearing," where "the State will bear the burden of proving by a preponderance of the evidence" the predicates for admission. Byrd, 198 N.J. at 350-52. "In other words, the State must demonstrate that the defendant by his wrongful conduct, directly or indirectly, caused the witness's unavailability − that is, caused the witness's physical absence or the witness's refusal or inability to testify." Id. at 352. To sustain its burden of proof, the State may present "circumstantial evidence of defendant's direct or indirect 'wrongdoing.'" Rinker, 446 N.J. Super. at 364. Last, "the court must determine that the statement bears some indicia of reliability." Byrd, 198 N.J. at 352. In that regard, a witness's statement found "to be reliable in light of all the surrounding circumstances, will be admissible as substantive evidence if the State establishes that the defendant wrongfully procured the witness's unavailability." Id. at 353.[22]

> In those cases in which the witness is available to testify but refuses to do so, due to alleged threats or fear induced by the defendant, the court ordinarily should advise the witness of his obligation to testify and that if

---

[22] The Byrd Court adopted the methodology applied in State v. Gross, 121 N.J. 18, 29 (1990), to determine the reliability of statements in the case of recanting witnesses pursuant to N.J.R.E. 803(a)(1). Byrd, 198 N.J. at 352-53.

he refuses to do so, he will be held in contempt. A witness must know that there will be consequences if a court order is disobeyed. If the witness continues to refuse to testify after the threat of contempt, he will be deemed an unavailable witness.

[Id. at 351-52.]

See also N.J.R.E. 804(a)(2) (stating a witness who "persists in refusing to testify concerning the subject matter of the [hearsay] statement despite an order of the court to do so," is "unavailable" for purposes of hearsay exceptions detailed in N.J.R.E. 804(b)).

Here, the State moved to admit prior statements made by Slaughter against Keller and others pursuant to N.J.R.E. 804(b)(9). During an evidentiary hearing conducted on May 9, 2017, the State produced Slaughter, Morris, and Mercer County Prosecutor's Office Detective Marc Masseroni as witnesses. The State also introduced numerous exhibits, including call list records from the Mercer County Correctional Center where Keller was confined prior to trial, recorded phone conversations between Keller and Slaughter, and unsigned recantation letters and other documents seized from Keller's cell. Following the hearing, the judge granted the State's motion in an oral opinion delivered from the bench on the same date. The judge memorialized his decision in an order entered May 25, 2017.

At the hearing, Slaughter confirmed he was unwilling to testify against Keller and other defendants at their upcoming trial, despite being held in contempt of court for violating a subpoena to testify, being incarcerated, and risking the revocation of his plea agreements with the State. Slaughter explained he would not testify because he "got threatening letters . . . at [his] house" and "[his] mother's house" and he was in fear for his life and the lives of his family members. Based on Slaughter's testimony, the judge entered an order holding Slaughter "in contempt of court" and found "the State . . . met its burden of proof . . . that th[e] witness [was] unavailable for the trial."

To establish the other prerequisites for admission of Slaughter's statements under N.J.R.E. 804(b)(9), Detective Masseroni testified regarding his investigation of witness tampering allegations involving Slaughter. According to Masseroni, when Keller's trial was previously scheduled to begin on September 26, 2016, Slaughter notified him that he received "threatening" letters that were delivered on September 25, 2016, to "his mother's house" and "his child's mother's house." During a September 27, 2016 meeting, Slaughter gave Masseroni a letter that was "left . . . between the door and the screen door of his child's mother's house" and a letter that was "left in the door slot of his mother's house." Both letters were admitted into evidence for purposes of the hearing.

The letter delivered to Slaughter's child's mother's house read:

> This for your baby dad. If he come to court you already
> know what it is. If he comes to court anybody can get
> it. He know it is a lot of us, and he know what it is. He
> know what we capable of doing. P.S. Don't be no fool,
> and because the other witness took his statement back.

The letter delivered to Slaughter's mother's house read:

> I ain't gonna say no name but you already know who
> this is. My people about to start court, so you already
> know, so you know what it is about. My people know
> where you at, including your mom, your daughter, your
> daughter mom house . . . P.S. If you come to court you
> already know. I ain't got to know more. You know
> what it is already.

Slaughter suspected Morris delivered the letters because Morris "was the only one involved in the case [who] knew where he lived" and was not in custody at the time. Slaughter also told Masseroni "he was getting calls from . . . defendants through three-way phone calls from the jail" and provided Masseroni with the incoming phone number. According to Masseroni, Slaughter was "shaken up" and "seemed . . . scared."

Once Masseroni located Keller at the Mercer County Correctional Center, he subpoenaed records for the number Slaughter had provided for the period July 1 to September 28, 2016, and discovered that Keller had placed Slaughter's number on a fellow inmate's call list to circumvent the jail's screening process,

54

which prevented inmates from communicating with victims and witnesses. The inmate, Immanuel Covington, told Masseroni he provided Keller and Keller's cellmate "with his call list because he only used the phone for one person, so he had nine openings in his list." Keller added phone numbers to Covington's call list, including Slaughter's, to facilitate the calls.

As a result, Masseroni obtained a modified wiretap order for recordings of the "phone calls . . . made to . . . Slaughter's cell phone." Masseroni identified "at least seven" calls in which Keller spoke directly to Slaughter. Masseroni also obtained search warrants for "any kind of documentation" located in Keller's cell and seized numerous letters from Keller's cell, including two unsigned "recantation letters." One of the recantation letters was prepared for Slaughter's signature and indicated that Slaughter lied when he provided statements to police.[23] Other letters seized consisted of communications between defendants about the case.

From October to December 2016, Slaughter's whereabouts were unknown to Masseroni and other law enforcement officers. On December 13, 2016, when Slaughter was eventually located, he "yell[ed] and scream[ed]" about law

---

[23] The other recantation letter was prepared for Ray Manigo, the only eyewitness to Paye's murder.

enforcement's inability to protect him and divulged to Masseroni for the first time that "two guys . . . with guns" had come "to his house the day before he was supposed to come in for the [aborted] trial." Although Slaughter did not "know their names," he "knew . . . they were . . . friends of . . . Keller." Slaughter said the men "spoke about the case" and "ask[ed] hm if he was going to testify." According to Slaughter, "[h]e told [the men] what they wanted to hear so that they would leave." Slaughter's daughter was with him when the men showed up at his house.

During the December 13 meeting, Slaughter told Masseroni he would no longer cooperate in the prosecution of Keller and the other defendants and would not testify at their trial. Nonetheless, Masseroni questioned Slaughter about the phone calls from the jail, and Slaughter identified himself as well as Keller on the calls. According to Slaughter, the calls started around the time an article appeared in the newspaper indicating he was going to testify at the trial. Some of the calls were three-way calls and some were direct calls from Keller. During those calls, Keller inquired whether Slaughter would testify and warned Slaughter to stay away from the police. Because "[h]e was scared," Slaughter responded by telling Keller "what he wanted to hear, which was that he wasn't going to [testify]." When Masseroni showed Slaughter the recantation letter

56

found in Keller's cell, Slaughter said he never saw the specific letter before but noted it was similar to a letter Morris "tried to get him to sign." Slaughter avoided signing the letter by giving Morris "an excuse."

On January 27, 2017, Masseroni met with Slaughter again. Slaughter told Masseroni that "somebody had approached [Slaughter's] mother and had given her a piece of paper with a phone number" and instructed her to have Slaughter "call th[e] number." According to Slaughter, his mother "tore . . . up" the paper and "threw it away." Once again, Slaughter reiterated "he was not going to testify" because "he was scared for himself and his family[]." However, Slaughter never recanted his statements nor suggested they were not truthful.

Masseroni followed up with Slaughter's mother, who confirmed Slaughter's account about her receipt of the "piece of paper." However, she refused to cooperate with law enforcement out of fear. Masseroni also met with Morris on March 23, 2017. Morris, who was also scheduled to testify at Keller's aborted September 26, 2016 trial, told Masseroni that he was also contacted by Keller through Keller's girlfriend. Through subpoenas, Masseroni corroborated those contacts.

During Morris's testimony at the hearing, he confirmed he had been contacted by Keller wherein Keller told him Slaughter was not going to testify.

A-1623-17

Keller directed Morris to "[j]ust stay home" and not testify either. Further, according to Morris, "[s]ome months . . . before the [aborted] trial," Keller asked Morris to "get [Slaughter] to sign an affidavit" taking "his statement back." However, every time Morris asked Slaughter to sign the affidavit, Slaughter would "mak[e] an excuse" to avoid signing. Morris testified he approached Slaughter about signing the affidavit "[a]t least three times" at Slaughter's house but denied delivering any threatening letters to Slaughter's house.

Addressing the remaining requirements for admissibility under N.J.R.E. 804(b)(9), the judge concluded the State "met its burden of demonstrating by a preponderance of the evidence" that Keller engaged, directly or indirectly, in wrongdoing, that the wrongdoing was intended to procure the unavailability of Slaughter as a witness, and the wrongdoing did in fact procure the unavailability of Slaughter as a witness. In rendering his decision, the judge recounted that he had discharged the unsworn jury and adjourned the trial when he and defense counsel were advised by the State that Slaughter, the State's key witness, "could not be located" and there was a "concern[] that threats had been made on his life."

Based on Masseroni's "credible" and "forthright" testimony regarding the ensuing investigation into witness tampering, which the recorded phone calls

between Slaughter and Keller as well as the items seized from Keller's jail cell corroborated, the judge determined the evidence established Keller directly or indirectly sent threatening letters to Slaughter's home, made multiple threatening phone calls to Slaughter from jail, threatened Slaughter's family, sent men with guns to Slaughter's home on the day he was scheduled to testify, and attempted to obtain Slaughter's signature on a recantation letter.

Specifically, according to the judge, the letters delivered to Slaughter's mother's house and Slaughter's child's mother's house were clearly "a threat to [Slaughter]." Although the judge did not find Keller "necessarily authored [the letters]," the judge inferred under "the totality of [the] circumstances," that "the motivation behind the[] threats" in the letters was to prevent Slaughter from testifying at Keller's upcoming trial. Further, the judge was satisfied "Keller used . . . subterfuge in order to make [telephonic] contact with [Slaughter]" by "using the number assigned to Immanuel Covington," a fellow inmate in "the same pod of the Mercer County Corrections Center" as Keller. The judge recounted one call in particular in which Slaughter stated: "I'm not gonna put you all in no harm's way, as long as you don't put me in harm's way . . . ." The judge found Slaughter's comment was consistent with his intent to "tell . . .

Keller . . . anything that will get him off his back" because he was "in fear of [him]."

Additionally, the judge considered the "unsigned recantation statement[] prepared for . . . Slaughter" found in Keller's cell during the execution of the search warrants as well as Morris's testimony that he had been contacted by Keller and directed "to reach out to [Slaughter] to see if he could effectuate execution of [the recantation statement]." The judge also referred to the other letters found during the execution of the search warrants evidencing Keller's belief that "he had successfully intimidated [Slaughter]" to prevent him from testifying at Keller's upcoming trial, a belief validated by the necessity to abort the September 2016 trial based on "Slaughter's unavailability."

Regarding the two armed men who reportedly came to Slaughter's house the day before he was supposed to testify at the aborted trial, the judge noted while there was "no corroborating evidence that this occurred," it was "clearly . . . not out of character" given the violent nature of the acts alleged in the indictment. Finally, as to the unidentified person who approached Slaughter's mother and handed her a "piece of paper," the judge found the incident was confirmed by Masseroni's investigation and corroborated "the

60

concerted effort" being made "to intimidate . . . Slaughter, . . . his mother, . . . [and] the mother of his small child."

The judge also determined the sworn written statement provided by Slaughter on June 10, 2011, the video recorded interview of Slaughter dated November 1, 2010, and Slaughter's statements to Masseroni during the witness tampering investigation "were reliable in light of all the surrounding circumstances."  Applying the Gross factors adopted in Byrd, the judge found Slaughter's statements

> truthful because he was incriminating himself.  Mr. Slaughter said I sell dope. . . . [H]e has no motive to fabricate that he was the victim of this abduction and robbery.  These were his friends, and he seemed somewhat confounded as to why his friends would allegedly perpetrate these crimes against him.  The police did not pressure him to give these statements. The [c]ourt finds all these statements have an inherent believability to them.  And it appears that there is corroborative evidence of the statements he gave based upon all the testimony the [c]ourt heard . . . .

We discern no abuse of discretion in the judge's decision to admit Slaughter's statements at trial as substantive evidence under N.J.R.E. 804(b)(9). The judge meticulously followed the framework outlined in Byrd, made factual findings that are amply supported by the record, and properly applied the legal standards.  Contrary to Keller's arguments, the State complied with the notice

61

requirement, and Slaughter's refusal to obey the subpoena on pain of contempt and incarceration rendered him unavailable within the meaning of N.J.R.E. 804(b)(9).

V.

In Point IV of his counseled brief, Keller argues the trial judge "erred in denying [his] motion for [a] mistrial and sending the jury back for further deliberations, directly resulting in the partial, confused jury verdict subsequently delivered."  Keller asserts he is entitled to a new trial because the judge failed to ensure his right to a fair trial with an impartial jury.

The jury began deliberations at about 2:00 p.m. on June 27, 2017, after the final charge was delivered.  On that date, the jury requested a read-back of Slaughter's statements, which lasted over an hour, before being excused for the evening.[24]  The jury continued deliberating the following day, June 28, 2017. On that date, the jury requested a read-back of a portion of Ray Manigo's video statement but then withdrew its request when told it would have to watch the nearly two-hour statement in its entirety.

The jury continued deliberating the following day, June 29, 2017.  During the morning of June 29, the judge received a note from the jury stating:  "If we

---

[24]  Generally, the judge excused the jury for the evening at 4:30 p.m.

are hung on even one charge, are we hung on all?  If so, we are currently hung and I unfortunately believe we are unable to move forward."  While the judge discussed an appropriate response to the jury's question with counsel, he was informed by his Sheriff's Officer that one of the jurors had left the jury room. In the presence of counsel but outside the presence of the other jurors, the judge questioned the juror, asking "Do you believe you can return to the jury room and deliberate with your fellow jurors?"  The juror responded she could and gave the impression she left the jury room to regain her composure because all the jurors were "emotional."  The judge instructed the juror to "return[] with her fellow jurors" but not deliberate until they received further instructions from the court.

The judge then instructed the jury as follows:

> The jury's verdict must be unanimous as to each count. The inability to reach a unanimous verdict on any one count does not render unanimous verdicts on any other count void.  In other words, you can consider each of the . . . counts individually.  You must consider each defendant and each count separately.
>
> Now, I'm going to give you another instruction to assist you with your further deliberations throughout the day. It is your duty . . . as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges, judges of the facts.

So now, ladies and gentlemen, you've heard testimony over a four-week period. This was a very lengthy trial. I know you've been working very hard. We all appreciate the time you've put in and with that instruction I'm going to ask the [twelve] of you to return and continue your deliberations . . . .

There was no objection to the instructions.

The jury resumed deliberations. Following the luncheon recess, the judge received another note from the jury stating: "We are currently hung on the following charges, [c]ount [one] for one defendant, 1(a), 2(a) for both, . . . [c]ount [eight] for one defendant, and [c]ounts [twelve] through [fifteen]. Please advise us on further instructions." After consulting with counsel, the judge explained "[g]iven the length of the trial, . . . the complexity of [the] cases and knowing that [the jurors were] committed [to serve] through the end of the afternoon, [he was] inclined to give them additional time to deliberate."

After further discussion and over defense counsel's objection, the judge gave the following instruction in response to the jury's note:

64

Ladies and gentlemen, we've received your note indicating that you have reached a partial verdict and that you have reached a unanimous verdict as to certain counts involving one or more of the defendants and that you are hung on other counts. Yesterday you requested to watch the portion of Ray Manigo's video statement of January 20[], 2011 that the State showed in their closing statement. It describes the events in the basement.

Yesterday I advised you that the only alternative was to bring you into court to watch the entire video statement of Ray Manigo lasting one hour and [fifty] minutes. The [c]ourt can now provide you with the information you requested yesterday, however, based upon your deliberations over the last [twenty-four] hours, you may no longer have any interest in viewing any portion of Ray Manigo's video statement. In addition, we can show you his entire video statement. I'm going to have you return to the jury room so you can discuss this issue if you care to and your foreperson will advise me in writing how you wish to proceed.

In addition, I want to once again give you instruction to guide you with your continuing deliberations. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual . . . judgment. Each of you must decide the case for yourself but do so only through an impartial consideration of the evidence with your fellow jurors.

In the course of your continuing deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a

65

A-1623-17

verdict.  You are not partisans.  You are judges, judges of the facts.

After deliberations resumed, the judge received a series of notes from the jury.  One note stated the jury was "undecided whether or not . . . to watch [the video of Manigo's testimony]."  A second note stated the jury was "hung on all counts" despite advising the court earlier of a partial verdict.  The judge received a third note from the foreperson stating there were "two jurors . . . ignoring the law[]" on accomplice liability and "not taking their oath seriously."  Keller's attorney requested a mistrial "based on the dysfunction of the jury," and "the fact that there have already been two Allen[25] charges."

The judge denied Keller's request based on the jury's earlier note that it "had reached a partial verdict."  The judge also clarified he had not given the "outlawed" Allen charge but rather "the model jury instruction about further deliberations," also known as the modified Allen charge or the Czachor charge. See State v. Czachor, 82 N.J. 392, 404-06 (1980) (modifying the charge approved in Allen); see also Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013).

The judge then instructed the jury as follows:

---

25  Allen v. United States, 164 U.S. 492 (1896).

[L]adies and gentlemen, I received a note from your foreperson . . . which states . . . unfortunately, after going back after lunch, the jury is hung on all counts. Please advise.

The [c]ourt finds that somewhat perplexing because as you indicated in an earlier note, you had reached a partial verdict . . . . And there really doesn't appear to be any new information.

The foreperson also gave me another note indicating that perhaps some jurors are not following the law as to accomplice liability. That is a complex, legal term. You asked . . . for a layman's explanation and as I was struggling to come up with an answer, the note came in, in effect, you figured it out and moved on.[26] But certainly, accomplice liability is difficult to understand for judges and for lawyers. It's especially difficult for lay people. So I understand that you're struggling.

I'm going to send you back for further deliberations. You know, this has been a very lengthy trial and we're hopeful if possible to get a verdict. If you're not unanimous as to any count, you're going to tell me that and we respect that. But given the length of this trial, the time and resources you the jury have put in as well as the [c]ourt and counsel, I'm going to send you back. I'm going to give you an additional charge.

So you have indicated to me, ladies and gentlemen, that your deliberations have reached an impasse. Do you feel that further deliberations will be beneficial or do you feel that you've reached a point at which further deliberations would be futile?

---

26 The judge was referring to a note he had received from the jury the day before.

A-1623-17

Now, I'm going to ask you to return to the jury room. It's about 4:30. Given everything I've said, I'm going to ask you to deliberate another half hour to five o'clock. At five o'clock . . . you're going to send me a note saying, Judge, we're deadlocked, we have a partial verdict, whatever it is. But I'm going to ask all [twelve] of you to return to the jury room, deliberate another half hour . . . so we're hopeful if you can agree unanimously as to any one of the . . . counts, . . . obviously, if you're deadlocked and you cannot reach any unanimous agreement, . . . I will accept that from you . . . .

Subsequently, the jury sent a note indicating it had a partial verdict. Upon Keller's agreement, the judge accepted the partial verdict, specifying the counts on which the jury unanimously agreed. See R. 3:19-1(a) (setting forth the procedure for partial jury verdicts).

Keller asserts the judge erred in denying his request for a mistrial given the "dysfunction in the jury" evidenced by the jury having twice reported being deadlocked and one juror having left the jury room.

"The grant of a mistrial is an extraordinary remedy . . . ." State v. Yough, 208 N.J. 385, 397 (2011). "Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.' Appellate courts 'will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice.'" State v. Smith, 224 N.J. 36, 47 (2016) (citations omitted) (first quoting State v. Harvey, 151 N.J. 117, 205

68

(1997); and then quoting State v. Jackson, 211 N.J. 394, 407 (2012)). Similarly, the "determination as to whether a Czachor charge is warranted" is left to the "'sound discretion'" of the trial court and may be reversed only for an abuse of discretion. State v. Ross, 218 N.J. 130, 144 (2014) (quoting Czachor, 82 N.J. at 407).

In Czachor, our Supreme Court "provided guidance to trial courts confronted with a jury's declaration that its deliberations have progressed to an impasse." Ross, 218 N.J. at 143. The Court "adopted the model charge suggested by the American Bar Association," which was subsequently incorporated as the Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013). Id. at 144. In deciding whether to give a Czachor charge "[w]hen a jury communicates a deadlock, trial courts 'should be guided in the exercise of sound discretion by such factors as the length and complexity of trial and the quality and duration of the jury's deliberations.'" Ibid. (quoting Czachor, 82 N.J. at 407). "When the '"difference of opinion between members of the jury is clearly intractable," . . . then the jury is deadlocked and a mistrial should be declared.'" Id. at 145 (alteration in original) (quoting State v. Figueroa, 190 N.J. 219, 237 (2007)).

In cases involving multiple counts to an indictment or multiple defendants tried together, a trial court may accept a partial verdict "specifying the counts on which [the jury] has agreed." R. 3:19-1(a). "[T]rial courts possess the discretion to accept [partial] verdicts absent a showing of prejudice to the defendant." State v. Johnson, 436 N.J. Super. 406, 422-23 (App. Div. 2014) (alteration in original) (quoting State v. Shomo, 129 N.J. 248, 257 (1992)).

Here, given the complexity of the trial proofs in this multi-count, multi-defendant case and the length of the trial, the judge was properly concerned about the duration and quality of the jury's deliberations. We are satisfied the judge properly exercised his discretion in response to the jury's communications of an impasse by providing the model Czachor charge on two occasions and directing the jury to continue deliberations. See Ross, 218 N.J. at 138, 145 (upholding the giving of a Czachor charge when, after five days of deliberations, the jury stated it could not reach a unanimous decision). Indeed, the Czachor charge "may, as a matter of sound discretion, be repeated if the trial judge finds that the jury has been unable to agree." Czachor, 82 N.J. at 407; see also Figueroa, 190 N.J. at 235 ("We therefore left it to the sound discretion of the trial court to decide whether repeating the charge is appropriate when a jury reports that it is unable to agree.").

Significantly, only the final note stated the jury was hung "on all counts." The two earlier notes communicated an ambiguous inquiry and a partial verdict, respectively. Upon receipt of the final note, the judge properly asked whether "further deliberations would be futile" using the Model Jury Charges (Criminal), "Judge's Inquiry When Jury Reports Inability To Reach Verdict" (approved June 10, 2013). Because the "inquiry" charge "presumes that the jury has already indicated its deadlock and has been instructed about continuing deliberations" in accordance with the Czachor charge, it was proper to give the Czachor charge first. Model Jury Charges (Criminal), "Judge's Inquiry When Jury Reports Inability To Reach Verdict" n.1 (approved June 10, 2013).

Even if the judge had asked earlier whether "further deliberations would be futile" and the jury had said "yes," it would still have been proper for the judge to then give the Czachor charge. Johnson, 436 N.J. Super. at 415 n.10. Indeed, the Ross Court rejected the idea "that an initial impasse signals the end of meaningful deliberations"; our Court instead "contemplates that a previously deadlocked jury can conduct fair and effective deliberations notwithstanding an earlier impasse." 218 N.J. at 154; see also ibid. at n.5 (explaining Czachor "is premised upon the principle that a properly instructed jury can and will meaningfully deliberate, notwithstanding a prior declaration of an impasse").

In Ross, the jury sent a note stating it was "'unable to reach a unanimous decision on any count'" and asking for additional instructions. Id. at 138. The Court found the jury's note "did not signal an intractable divide that would warrant a declaration of mistrial. Instead, it communicated that its effort to reach consensus on the issues had fallen short." Id. at 145. Here, given the jury's earlier communication that it had reached a partial verdict, the judge properly inferred the jury's purported impasse was not intractable.

Further, based on the questioning of the juror who temporarily left the jury room and the juror's credible affirmation establishing her ability to resume deliberating, the judge ensured any problems were due to juror interaction during the deliberative process. Indeed, "[a] juror cannot be removed merely because she is taking a position at odds with other jurors' views." State v. Jenkins, 182 N.J. 112, 125 (2004). "A juror has the unassailable right to see the evidence in her own way and to reach her own conclusions, regardless of how overwhelming the evidence or how illogical her view may appear to other jurors." Ibid. "'If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations.'" Ibid. (quoting State v. Hightower, 146 N.J. 239, 254 (1996)). That procedure was followed here.

To be sure, "a juror may not be removed for reasons related to the 'deliberative process.'" State v. Banks, 395 N.J. Super. 205, 215 (App. Div. 2007), overruled in part on other grounds by Ross, 218 N.J. at 154-55; see also Jenkins, 182 N.J. at 124 ("We have restrictively interpreted the phrase 'inability to continue' in Rule 1:8-2(d)(1) to protect a defendant's right to a fair jury trial, forbidding juror substitution when a deliberating juror's removal is in any way related to the deliberative process." (quoting R. 1:8-2(d)(1))). Indeed, there are "strong policy reasons which shield the deliberative process of juries." State v. Young, 181 N.J. Super. 463, 468 (App. Div. 1981); see also State v. Corsaro, 107 N.J. 339, 346 (1987) ("The key to the proper discharge of th[e] duty by the jury is the deliberative process, which must be insulated from influences that could warp or undermine the jury's deliberations and its ultimate determination."). Because we discern no abuse of discretion in the judge's handling of the jury's notes or the juror's brief departure from the jury room, there was also no manifest injustice requiring the extraordinary step of a mistrial.

## VI.

In Point V of his counseled brief, Keller challenges his sentence as excessive and the judge's finding of aggravating and mitigating factors as improper. We disagree.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts.'" State v. Cuff, 239 N.J. 321, 347 (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

After appropriate mergers and dismissals, the judge sentenced defendant to fifty-six years' imprisonment, subject to NERA, on the murder charge (count two), a concurrent fifteen years' imprisonment, subject to NERA, on the robbery charge (count five), a concurrent four years' imprisonment on the eluding charge (count ten), a concurrent twelve months' imprisonment on the tampering with evidence charge (count twelve), and a consecutive five years' imprisonment,

74

with a two-and-one-half year period of parole ineligibility, on the witness tampering charge (count twenty-one).[27]

The judge, who "had a great deal of exposure to th[e] case" based upon his adept handling of "all the dispositive motions" as well as presiding over "th[e] lengthy trial," found aggravating factors one, three, six, and nine, and no mitigating factors. See N.J.S.A. 2C:44-1(a)(1) ("[t]he nature and circumstances of the offense, and the role of the actor [therein], including whether or not it was committed in an especially heinous, cruel, or depraved manner"); N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that the defendant will commit another offense"); N.J.S.A. 2C:44-1(a)(6) ("[t]he extent of the defendant's prior criminal record and the seriousness of the offenses"); and (N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law"). The judge was "clearly convinced the aggravating factors substantially outweigh[ed] the non-existing mitigating factors."

Regarding aggravating factor one, the judge stated:

> [N]ormally even in a murder case I'm reluctant to find aggravating factor number one, just because I'm always concerned by double counting . . . . But the [c]ourt

---

[27]  In imposing the consecutive sentence, the judge applied the principles enunciated in State v. Yarbough, 100 N.J. 627, 643–44 (1985), as well as the requirement codified in N.J.S.A. 2C:28-5(e) for a consecutive sentence. Defendant does not appear to challenge those determinations.

finds support that this murder occurred in a very cruel and depraved manner. That this victim was executed. He was bound and tied with duct tape. He was physically tormented . . . [and] he knew this defendant and co[]defendants were planning on his execution. His ears were not duct taped. Obviously he heard orders being given that bleach and garbage bags should be bought at a local deli. And, obviously, the victim knew that was to clean up the murder that was about to be taking place.

There's no question in the [c]ourt's mind that . . . Keller was the leader of these [codefendants]. . . . He was giving orders. He was the one who executed the victim.

As to aggravating factor six, the judge cited Keller's prior criminal history consisting of an adjudication of delinquency for a drug possession charge and two prior indictable convictions for drug distribution related charges, for which he served custodial terms in State prison. One of the prison terms was imposed after Keller violated probation. The judge stressed "even though [Keller] was only an adult for five years before the subject murder, for three[-]and[-]a half years [of those five, he was] in [S]tate prison." Regarding aggravating factor three, the judge had "no doubt" Keller would "commit another offense if given the opportunity" because Keller had "led a life where [he had] completely disregarded the laws of society." Moreover, according to the judge, the murder showed Keller had "no regard [for] life" and "no [conscience]." Additionally,

the judge gave "great weight" to aggravating factor nine, to deter Keller and others from resorting to murder "to settle their scores."

Furthermore, the judge found no "credible evidence to support any mitigating factor." The judge rejected Keller's contention that mitigating factor eleven applied because of the hardship the sentence would impose on his six-year-old daughter. See N.J.S.A. 2C:44-1(b)(11) ("[t]he imprisonment of the defendant would entail excessive hardship to . . . [his] dependents"). The judge stated, "while it's certainly a hardship for a young girl to grow up without knowing her father," given the fact that Keller "has never financially supported his daughter," it was "not an excessive hardship."

Defendant argues the judge engaged in impermissible double counting by finding aggravating factor one because "this was already part and parcel of the murder crime of which [Keller] was convicted." However, in appropriate cases, as here, "a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75. Defendant also argues the record supported finding mitigating factor eleven. However, as we explained in State v. Hyman, 451 N.J. Super. 429, 460 (App. Div. 2017), "[d]efendant did not show that his child[] would experience 'excessive' hardship from his

absence, and . . . presented no evidence that he was a significant source of support for his . . . child[]" to justify finding mitigating factor eleven.  See also State v. Dalziel, 182 N.J. 494, 505 (2005) (finding mitigating factor eleven unsupported by the record because the defendant "has never lived with or supported his fiancée and child.").

In sum, based on our review of the record, we are satisfied the judge set forth his reasons for Keller's sentence with sufficient clarity and particularity, made findings that are amply supported by competent and credible evidence in the record, correctly applied the sentencing guidelines in the Code, and did not abuse his sentencing discretion.

## VII.

We need not tarry long on Keller's pro se arguments.  First, he asserts he received ineffective assistance of counsel (IAC) because his trial counsel was not available on June 27, 28, and 29, 2017, during the final charge and jury deliberations.  "Our courts have expressed a general policy against entertaining [IAC] claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record."  State v. Preciose, 129 N.J. 451, 460 (1992).  Thus, such claims are better suited for post-conviction relief (PCR) proceedings.  Ibid.

On this record, we find inadequate support for Keller's IAC claim. While trial counsel was not physically present in the courtroom on the dates in question because he had "injured himself" over the previous weekend and was undergoing a medical procedure, a pool attorney was appointed to stand in as counsel during the final charge and the beginning of jury deliberations on June 27. Trial counsel returned and participated telephonically for the entirety of the June 28 and 29 proceedings. The judge also arranged for trial counsel to have confidential telephonic conversations with Keller if needed. Nevertheless, "while we conclude that this record is inadequate to support [the] claim, our affirmance is without prejudice to defendant's petition for [PCR] on the subject." State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991).

Finally, Keller's intertwined arguments that the judge erred in failing to voir dire or substitute two unidentified jurors whom the foreperson claimed were ignoring the law regarding accomplice liability were addressed in responding to Point IV of his counseled brief and lack sufficient merit to warrant additional discussion in a written opinion. R. 2:11-3(e)(2); see State v. Valenzuela, 136 N.J. 458, 464, 473 (1994) (finding reversible error in the trial court's decision to discharge a deliberating juror for reasons "arising from the juror's interactions with the other jurors" where the juror reportedly did not "understand the

process"); State v. Dorsainvil, 435 N.J. Super. 449, 483 (App. Div. 2014) (noting

"a passionate exchange of conflicting views" is part of the sanctity of the jury's

deliberative process not warranting judicial intervention).[28]

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[28] The prosecutor aptly addressed the foreperson's note as follows:

> With respect to the other note about two jurors maybe not following the law, that's not for anyone – that's not for any other juror to say . . . [;] just because someone disagrees with . . . your vote . . . doesn't mean that they are ignoring the law. There are a lot of different ways to apply the law especially in this case so there are going to be varying perspectives and obviously different votes and . . . I don't know what kind of further investigation there can be done with respect to the foreperson saying they believe two jurors are ignoring the law.

A-1623-17